Court of Appeals for the Fourth Circuit in a *per curiam* opinion, we find at page 239 of the Circuit Court opinion in 238 F.2d, the following language:

"We think that the decision of the Tax Court was correct and should be affirmed. It was shown therein that the loss was not realized within the meaning of the tax statute and regulations, in that the asset was retained and used by the taxpayer in carrying on its business. See also the prior decision of the Tax Court in Reporter Pub. Co. v. Commissioner, 18 T.C. 86, affirmed by the Tenth Circuit, 201 F.2d 743.

"There is no merit in the taxpayer's contention that the earlier decision was erroneous because it failed to take into account the fact that the bylaws of the Associated Press which constituted the membership contract between the Associated Press and its members, were amended after the decision of the Supreme Court in order to comply therewith. We agree with the conclusion of the Tax Court in the pending case that this circumstance amounted only to an elimination of the non-competitor provision of the original contract and that no loss was realized within the meaning of the tax statutes because the membership was not discarded but was continued for use in the taxpayer's business."

To the same effect in a very similar case involving the same issue was the decision in the New York Sun v. Commissioner, supra.

In the light of these decisions in which it has been uniformly held in very similar fact situations that plaintiffs were not entitled to the deduction, we are unable to conclude that plaintiff has sustained such a loss as is deductible under the Internal Revenue Code.

The question also arises as to whether one should be prohibited from deducting as a loss money spent in securing an illegal privilege. However, for the reasons hereinbefore set forth, we find it unnecessary to pass upon this issue.

Plaintiff is not entitled to recover. Its petition is dismissed.

It is so ordered.

LARAMORE, MADDEN, WHITAKER and LITTLETON, Judges, concur.

**MANUEL RODRIGUEZ TRADING CORP. and Manuel Rodriguez**

v.

**The UNITED STATES.**

**No. 50197.**

United States Court of Claims.
July 12, 1957.

Mr. Homer C. Clay, Chicago, Ill., for plaintiff.

Mr. Edward L. Metzler, Washington, D. C., with whom was Mr. Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This is a suit by plaintiff, Manuel Rodriguez Trading Corporation, to recover sums of $135,442.79 and $28,756.81 paid to the U. S. Maritime Commission. The defendant counterclaims for damages, and Manuel Rodriguez has been joined as a party plaintiff under rule 23 of this court, 28 U.S.C.A.

The $135,442.79 was paid to the Maritime Commission by plaintiff under an agreement made in December 1948 that the Commission would approve plaintiff's sale of the tankers *Capitan* and *Sugarland* to the Argentine Naval Commission and their transfer to Argentine registry and flag, which was accomplished. The $135,442.79 represented reductions in the statutory sale price of the two tankers which had been acquired by a contract dated April 6, 1948. The reductions were allowed plaintiff by the Maritime Commission under section 3(d) (1) of the Merchant Ship Sales Act of 1946, 60 Stat. 41, as amended 62 Stat. 1196, 1199. The $28,756.81 represents the Maritime Commission's charges for "desirable features" not found in standard vessels, payment for which was agreed to by plaintiff in the contract dated April 6, 1948, and by an agreement made in December 1948.

Plaintiff contends that it is entitled to recover the $135,442.79 under the decision of this court in Clapp v. United States, 117 F.Supp. 576, 127 Ct.Cl. 505 and asserts that the Maritime Commission did not have authority to condition its approval of the sale and transfer by requiring that the class allowance be refunded, and that such requirement was also a breach of contract.

Plaintiff contends it is entitled to recover the $28,756.81 paid for "desirable features" under the decision of this court in A. H. Bull Steamship Co. v. United States, 108 F.Supp. 95, 123 Ct.Cl. 520. It contends that the statutory formula provided by the Merchant Ship Sales Act, supra, requires the cost of desirable features to be added to the statutory sales price and then depreciated, and that this results here in the cost of desirable features being wholly absorbed and lost, although the floor price is maintained. Plaintiff further contends that a citizen's purchase of tankers after March 1, 1948, for the purpose of resale to aliens, would not violate Public Law 423, 62 Stat. 38, 50 U.S.C.A.Appendix, § 1739 note, if the Maritime Commission approved.

The defendant contends that plaintiff procured the two tankers from the Maritime Commission and obtained price reductions of $135,442.79 on the basic misrepresentations that it was acquiring the tankers as a United States citizen for operation under American flag and registry, and that plaintiff, knowing that sales to noncitizens were expressly prohibited after March 1, 1948, by Public Law 423, was not acquiring the tankers for American flag ownership and operation, but in

order to sell and transfer them to the Argentine Naval Commission for operation under Argentine flag and registry.

Public Law 423 provides in pertinent part as follows:

"(b) Notwithstanding the provisions of subsection (a), no contract of sale under section 6 of the Merchant Ship Sales Act of 1946 shall be made after March 1, 1948; and nothing contained in this or any other Act shall be deemed to authorize the United States Maritime Commission to charter any war-built vessel (as defined in the Merchant Ship Sales Act of 1946) to any person who is not a citizen of the United States (as defined in the Merchant Ship Sales Act of 1946)."

The government further contends that it is entitled to judgment on its counterclaim for the losses and damages sustained by reason of plaintiff's misrepresentations.

The facts as found by the Commissioner and adopted by the court are as follows:

The Manuel Rodriguez Trading Corporation was, from January 1947 to February 1951, a New York corporation with its principal place of business at 220 Broadway, New York City, New York. Only 80 shares of the corporate stock were issued. During the corporate existence Manuel Rodriguez was the president and actually operated as sole owner. As of September 2, 1948, he had formally acquired the 30 shares issued January 30, 1947, in the name of his wife, Adela Rodriguez, a citizen of Cuba. As of December 29, 1950, the assets of the corporation were distributed to the two remaining stockholders, Rodriguez receiving $336,191.81 and Louis Russell $4,255.59 A certificate of dissolution was filed February 1, 1951, dated December 29, 1950.

Manuel Rodriguez has been impleaded personally and by order of the court joined as a party plaintiff. The term plaintiff as used herein refers to the corporation or to Manuel Rodriguez personally.

Plaintiff by contract dated April 6, 1948, acquired from the U. S. Maritime Commission two T–1 tankers, the *Sugarland* and the *Capitan*, at a price of $887,019 each. The price was in accordance with the Merchant Ship Sales Act of 1946 and the rules and regulations issued pursuant thereto as set forth in the Maritime Commission's General Order 60. The contract provided for a reduction of price by an amount equal to the cost, as determined by the Commission, which would be required to enable the Commission to deliver the vessels in class with valid certificates of classification and inspection in accordance with the minimum requirements of the rules and regulations of the American Bureau of Shipping and the U. S. Coast Guard Marine Inspection. Plaintiff filed claims for such price reductions and was allowed $135,442.79, i. e., on the *Sugarland* $4,094 for repairs and $15,259.37 for predelivery and maintenance expenses, and on the *Capitan* $94,067 for repairs and $22,022.42 for predelivery and maintenance expenses.

Title to the *Sugarland* and *Capitan*, respectively, was transferred to plaintiff on June 8, 1948, and August 20, 1948. Plaintiff thereafter, on October 21, 1948, applied for approval to sell the tankers to the Argentine Naval Commission and to transfer them to Argentine registry and flag. On December 7, 1948, the Commission approved the sale and transfer on the condition that the price reductions or class allowances were paid. Plaintiff agreed and deposited a $200,000 check of the Argentine Naval Commission. The tankers were consequently transferred from United States registry. On June 3, 1949, plaintiff requested that the Maritime Commission reconsider its requirement that the $135,442.79 be paid, but the Maritime Commission adhered to its decision, and denied a request for reconsideration.

The Maritime Commission also determined that the tankers contained desirable features and pursuant to the purchase contract and plaintiff's consent charged plaintiff the depreciated value

of the desirable features, i. e. $27,650 on the *Sugarland* and $1,105.96 on the *Capitan*. The Maritime Commission also determined that under Article IV of the contract applying to a citizen sale plaintiff should be charged only $42 for unamortized repairs made on the *Sugarland,* deducted this amount from a deposit and refunded the balance.

## The Government's Counterclaim

The Merchant Ship Sales Act of 1946 provided that the Maritime Commission might sell certain Government-owned war-built vessels to a citizen of the United States, as defined in the act, at a "statutory sales price." In the case of tankers statutory sales price was defined in the act (section 3(d) to mean "an amount equal to 87½ per centum of the prewar domestic cost of a tanker of that type" subject to adjustments set forth therein. In the case of a tanker the adjustments could not reduce the sales price to less than 50 percent of the domestic war cost and the price of the *Capitan* and *Sugarland,* T-1-M-BT tankers, was fixed at the floor price of $887,019. Under certain conditions sales to noncitizens were authorized "at not less than the statutory sales price" but Senate Joint Resolution 173, Public Law 423, 80th Congress, 2d session, approved February 27, 1948, expressly prohibited sales to noncitizens after March 1, 1948. The questioned transactions occurred subsequent to March 1, 1948.

In November 1947 an employee of the Maritime Commission, John E. Jacobsen, advised Rodriguez that there was a possibility that ten T-1 tankers might be purchased from the Maritime Commission for resale to Argentina. At that time the Argentine Government had a purchasing commission known as the Argentine Naval Commission located in New York City. The Naval Commission was headed by Rear Admiral Athos Colonna, and Captain Julio Mazzoli, Naval Architect, was in charge of ship inspections. On December 19, 1947, plaintiff retained Homer C. Clay and Jacobsen to represent it in bringing about the sale of ten or less tankers. Clay and Jacobsen were to receive on a contingent basis a fee of $25,000 for each tanker purchased. On December 30 and 31, 1947, Rodriguez conferred with representatives of the Argentine Naval Commission advising that the present basic sales price of the ten tankers was $887,019 but that he would sell them for $965,000 each (or less if more than five were obtained) with title and authority to change the flag, etc., the offer being subject to approval of the Maritime Commission. On February 4, 1948, Clay wired Rodriguez that there was a strong probability Congress would prohibit sales of war-built vessels to foreign countries after February 29 and urged filing an application immediately. Plaintiff and the Argentine Naval Commission then entered into a contract whereby the Naval Commission was to purchase ten tankers from plaintiff for $935,000 each and delivered two checks, payable to the Treasurer of the United States, for $1,000,000 each. The checks were certified respectively by the Chase National Bank and the National City Bank, both of New York City on February 16, 1948.

On February 18, 1948, plaintiff made written application to the Maritime Commission to purchase ten tankers at the statutory sales price for transfer to the Argentine flag stating that it was not then and never had been engaged in the shipping business. On March 1, 1948, the Maritime Commission disapproved the application but at 11:30 P. M. March 1, 1948, approved the sale of one tanker to plaintiff for transfer to Argentina.

Senate Joint Resolution 173, as stated, prohibited the sale of a war-built vessel to a noncitizen after March 1, 1948. Rodriguez was quite aware of the prohibition which had been imminent and so wrote the Argentine Naval Commission on March 5, 1948. At the same time plaintiff advised that Commission that Rodriguez was endeavoring to obtain one additional tanker on the premise the cor-

poration was a citizen purchaser, as well as still another vessel, and that their efforts will be continued.

On March 7, 1948, plaintiff's attorney in fact, Homer C. Clay, wired the Secretary of the Maritime Commission as follows:

Application Manuel Rodriguez Trading Corp. Hereby Amended To Eliminate All Reference To Transfer Of Ships To Argentine Registry Applicant Desires To Purchase As American Citizen Terms Cash On Delivery With Two Million Dollars Now Deposited With Application To Be Applied On Purchase Price.

On March 10, 1948 plaintiff filed a formal amendment to its February 18, 1948 application by striking therefrom:

\* \* \* \* \*

" \* \* \* All reference to the transfer of the vessels referred to therein to foreign flag or registry and to provide that the applicant will purchase any one or more of the vessels referred to in said application as a United States citizen (applicant is a New York corporation) for operation under the flag and registry of the United States and to further provide that should applicant be granted the right to purchase any vessel or vessels pursuant to its amended application, applicant will obtain the services of one of the established and experienced ship operating companies to operate said vessel or vessels."

On March 11, 1948, plaintiff's amended application was referred to the Maritime Commission by memorandum from the appropriate officer, the Chief of the Large Vessel Sales Division, James L. Pimper, who recommended the sale of two T1–M–BT tankers with the advice that the "applicant wishes to eliminate original reference to transfer to Argentine registry and purchase as an American Citizen" and to pay cash in full on delivery. The Commission was advised that:

Applicant claims no shipping experience but states that it will obtain the services of one of the established and experienced ship operating companies to operate the vessels when purchased.

\* \* \* \* \*

" \* \* \* since the applicant offers to pay cash in full for the vessel, the Commission is justified in considering that the applicant possesses the necessary financial resources.

\* \* \* \* \*

"Applicant proposes to operate the vessels in established tanker trades, chiefly from North Atlantic ports to the River Platte and occasionally from Venezuelan ports to the River Platte. \* \* \* "

On March 12, 1948, the Commission approved plaintiff's application as to three T–1 tankers. However, the Navy Department requested the transfer of one tanker and the Maritime Commission on March 31, 1948, approved the sale of two tankers, the *Capitan* and *Sugarland*, "for operation under United States flag," the terms of payment to be "cash in full on delivery."

Under date of March 31, 1948, the date the Maritime Commission approved the sale for operation under United States flag, plaintiff and the Argentine Naval Commission entered into contracts relating to the *Capitan* and *Sugarland*. The contracts recited in part that plaintiff sold said tankers to the Naval Commission with a view to their transfer to the Argentine Navy, that the Naval Commission would turn over the official price of $887,019 each, and upon obtaining plaintiff's approval for transfer to the Argentine flag the Naval Commission would pay the price fixed by the offer of December 31, 1947; i. e., $965,-000 if 1 to 4 tankers were acquired. Paragraph G of the contracts provided that in the event a legal transfer was not possible and in the event of a disagreement over settlement the ships would be sold without loss to plaintiff, or 20 percent of the profits. In the event of United States expropriation its payment was to be immediately transferred to the Naval Commission. The Naval Commis-

sion was also to pay all other expenses incurred, subject to its written approval.

In reliance upon plaintiff's representations that the tankers were purchased by plaintiff as a United States citizen for operation under the flag of the United States the Maritime Commission, under date of April 6, 1948, entered into the formal sales contract referred to in finding 2 for sale of the *Capitan* and *Sugarland* at $887,019 each.

The Argentine Naval Commission made the down payments on the *Capitan* and *Sugarland* on April 2, 1948, by issuing two $88,701.90 checks.

On April 28, 1948, the Argentine Naval Commission paid plaintiff the $798,317.-10 balance of the $887,019 floor price on each tanker.

Plaintiff's books and accounting records show the tankers were sold to the Argentine Naval Commission in April 1948, that the tankers were purchased for resale and not for operation and that they were carried as merchandise inventory until June 30, 1948, when the books showed the Argentine Naval Commission had advanced $965,000 on sales contracts on each of the tankers. Plaintiff's Federal tax returns also show the purchases were for sale rather than operation.

Neither Rodriguez nor the corporation had ever been engaged in the shipping business and had no experience in operating tankers. No effort was made to obtain the services of a ship operating company or to hire officers or a crew.

Following the allocation of the tankers Rodriguez was in constant consultation with the Argentine Naval Commission over the control and disposition of the tankers. The Argentine representatives inspected the vessels, work plans and specifications were submitted to them in advance, and they prepared plans and specifications for repairs and sent them to Rodriguez in August 1948. Upon closing the sales with the Maritime Commission in June and August 1948 the bills of sale and master carpenter's certificate were delivered to plaintiff's attorney-in-fact, Homer C. Clay. These documents were promptly turned over to the Argentine representatives. Pursuant to arrangements between Rodriguez and Admiral Colonna, the Argentine Naval Commission also stationed its own crew aboard the tankers to act as watchmen pending the contemplated transfer.

In August 1948 plaintiff inserted an ad in the New York Journal of Commerce advertising T-1 tankers for sale: "United States flag. Immediate delivery. Principals only. All cash in dollars." A similar advertisement was inserted in the New York Times of August 29, 1948. Four responders indicated a desire for foreign registry and two suggested domestic use, but plaintiff communicated with none.

Under date of August 30, 1948, however, a letter was prepared to plaintiff from the Argentine Naval Commission over the signature of Rear Admiral Colonna in which the Argentine Naval Commission purported to answer the ad appearing in the New York Journal of Commerce for August 27, 1948, and offered to purchase tankers with U. S. currency. A copy of the ad was attached to the Naval Commission's letter.

On October 21, 1948, plaintiff transmitted to the Maritime Commission its application for the approval required by Sections 9 and 41 of the Shipping Act of 1916 as amended 46 U.S.C.A. §§ 808, 839, of a proposed sale and transfer of the *Capitan* and *Sugarland* to Argentine registry and sale to an alien, namely, the Argentine Naval Commission. The applications represented that the tankers had never been operated, and that they had been on the market for sale to American citizens for three months prior to the application but no offers had been received. The proposed sale price was represented as "actual cost of vessel to owner" payable in cash. The application attached Admiral Colonna's letter purporting to answer the ad, and represented that sale and transfer to the Argentine Naval Commission was desired as the tankers were unsuitable, conditions had changed, the initial "cost and

repairs for the owner's account" exceeded $1,800,000 and maintenance costs were a threat to the company's solvency.

The Chief of the Maritime Commission's Bureau of Government Aids recommended that the application be denied. However, at a meeting on December 7, 1948, Homer C. Clay and Ralph Immell appeared before the Commission and, after referring to the information contained in the application, advised the Commission further that plaintiff's president had invested his entire personal fortune of $1,800,000 in the tankers, that to cut expenses crews had been reduced and guards put on board, and that plaintiff was obliged to sell the tankers or go into bankruptcy. It was also represented that the proposed sales price of $912,000 per tanker, adjusted for the value of the heating coils, might enable Rodriguez to break even but he stood to lose $45,-000. At the hearing Mr. Clay specifically, on behalf of the plaintiff, denied any possibility of an advance arrangement with the Argentine interests whereby later approval of the sale and transfer would be sought. At the December 7, 1948 meeting the Commission by a 3 to 2 vote approved the sale and transfer " * * * upon the condition that any and all allowances made to the Manuel Rodriguez Trading Corporation for placing the vessels in class and all monies due and owing the Commission by the said Manuel Rodriguez Trading Corporation shall be paid to the Commission prior to the issuance of any orders authorizing the transfer of flag and registry of the said vessels and the company waives any claims for allowances." By memorandum of December 9, 1948, the Commission advised its Chief, Bureau of Government Aids, of its conditional approval, and on December 10, 1948 the Commission also notified plaintiff of its approval under the conditions noted above, and, because plaintiff requested that transfer orders be issued as early as possible requested a $200,000 deposit. The Commission advised that the deposit would not preclude reconsideration but "it is also understood that any future action by the Commission on this matter will be acceptable to you as final". Plaintiff accepted these prescribed conditions in a letter dated December 14, 1948, noting it "accepts and agrees" and deposited a certified check of the Argentine Naval Commission for $200,000.

Subsequently the Commission delivered transfer orders to plaintiff authorizing the sale of the tankers to the Argentine Naval Commission and their transfer to Argentine registry and flag. The conditions were not repeated in the transfer orders as neither the Commission's regulations nor practice required this.

The Maritime Commission had agreed to reconsider its action on the charges if plaintiff would accept such action as final. Plaintiff agreed to this. On June 30, 1949, Clay and Ralph Immell also filed a formal application for reconsideration repeating the same representations as were made before the sale to the Argentine Naval Commission. They stated the sale occurred "after issuance of the foreign transfer orders" and as plaintiff had sold at the price paid the Maritime Commission it could not be reimbursed by the Argentine Naval Commission because of the refund of the class allowances. It was stated that there was no understanding that Rodriguez would appear subsequently and ask for an order to resell and that if the corporation "having purchased these ships, had let them sit idle and then subsequently sold them to the Argentine Naval Commission" the allowances should be wiped out and the plaintiff should not profit by them. The Commission denied the request August 12, 1949, and plaintiff was so advised.

Prior to March 1, 1948, and subsequently, the plaintiff was acting, in effect, as agent for the Argentine Naval Commission in acquiring the tankers and that at all times plaintiff planned in one way or another to accomplish their transfer from the Maritime Commission to Argentina.

The *Capitan* and *Sugarland* were built in 1945. The Maritime Commission pursuant to the Merchant Ship Sales Act of 1946 determined that their domestic war cost was $1,774,038 each. Their 1947 costs would have been about 15 percent

greater or $2,040,143.70. In March 1948 the Argentine Naval Commission offered to pay $965,000 for each vessel. The Argentine Naval Commission paid $2,-202,223.87 for the tankers. According to plaintiff's available records, which do not show what occurred with respect to the $200,000 deposit made by check of the Argentine Naval Commission, plaintiff corporation made a gross profit of $153,-959.29 on the acquisition and transfer of the two tankers, exclusive of the $200,000 deposit.

The Maritime Commission received a total of $1,802.836.81 for the vessels which would have cost $4,080,287.40 to replace or $2,777,450.29 less than the replacement cost.

During the time the Maritime Commission was authorized to sell to noncitizens it charged noncitizens the unrecouped costs of repairs. In the case of the *Sugarland* this would have amounted to $49,894.01 but as a supposed citizen purchaser plaintiff was charged but $42 or $49,852.01 less. The Government also counterclaims for this item.

The facts clearly show and the court has found that plaintiff was acting, in effect, as agent for the Argentine Naval Commission in acquiring these vessels and that at all times plaintiff planned in one way or another to accomplish the transfer of these vessels from the Maritime Commission to the Argentine Naval Commission.

In this climate what then is the result of such action. Plaintiff says this court's decision in the Clapp case, supra, decides the question. However, we are not inclined to that view. The plaintiff in the Clapp case acquired the ship in question in 1949 from an owner who had previously acquired the same from the Maritime

Commission in 1947. In 1951 Norton Clapp contracted to sell the ship to a Finnish corporation and applied for approval of the same. The Maritime Commission approved the sale upon payment of the sum of $7,500 as "consideration for release of obligation to operate vessels under United States laws." The court in the Clapp case held that the limitation of sale to domestic bidders was because the Maritime Commission at that time was unwilling for ships to be sold to aliens at any price and that in 1951 the reasons for the restriction were no longer present. The court further found that price had nothing to do with either the restriction or the removal and the $7,500 charge was irrelevant.

It must be borne in mind that the plaintiff in the Clapp case was a citizen of the United States. Here the situation is different—plaintiff was acting as agent for the Argentine Naval Commission but by his actions and assertions acquired the vessels as a citizen of the United States, thereby circumventing the provisions of law regarding sale to a noncitizen. Plaintiff procured the tankers and obtained the price reductions or class allowances on the basis of representations that it was acquiring the tankers as a United States citizen for operation under the United States flag and registry, knowing that sale to noncitizens was prohibited under Public Law 423, supra, whereas in fact it was acquiring the vessels in order to sell and transfer them to a noncitizen.

Had the Argentine Naval Commission been permitted to purchase the tankers, certainly the United States could have exacted the $135,442.79 and could further have charged for the desirable features.[1]

1. The case of Esso Nederland N. V. v. U. S., Ct.Cl., 151 F.Supp. 285, 286, presented a similar situation wherein a noncitizen sought relief from payment for desirable features pursuant to A. H. Bull Steamship Co. v. United States, supra. The court in the Esso Nederland case held that the specific intention which the parties intended and incorporated in the contract was that the desirable fea-tures were to be paid in addition to the already known floor prices of the ships. The contract provision in the instant case is exactly the same as in the Esso Nederland case and is as follows:

"The Buyer agrees, if it shall be determined by the Commission upon examination of the (each) vessel, that the vessel lacks or contains desirable features as defined in clauses (2) and (3) of Sec. 3(d)

Under these circumstances we believe plaintiff is in the same position as the Argentine Naval Commission, a noncitizen, would have been had it negotiated and purchased the tankers. That is to say, the Maritime Commission had every right to charge the Argentine Naval Commission more for the vessels than it could have charged a citizen, and there is no reason to believe that such a charge would not have been made. Thus the Maritime Commission, by reason of the representation of plaintiff, lost the difference in sale price and, if fraud were present, we could think of no reason why plaintiff should be permitted to profit thereby. However, no specific finding of fraud is made in this case and in the absence thereof, plaintiff would not be chargeable under a constructive trust for the proceeds received from the sale to the Argentine Naval Commission. Restatement of the Law of Restitution, Ch. 13, sec. 202; United States v. Newbury Mfg. Co., D.C., 36 F.Supp. 602.

Under these circumstances the Government is entitled to retain the $135,442.79 which plaintiff as a citizen saved under the floor price and the $28,756.81 charged for desirable features.

Defendant counterclaims for losses and damages sustained, i. e., (a) the value of the *Capitan* and *Sugarland*; (b) the differences between the amount paid for the tankers by the Argentine Naval Commission and the amount received by the Maritime Commission, i. e., $399,387.06; (c) the gross profit made by plaintiff on the illegal transaction; and (d) $49,852.-01 for unrecouped repairs.

We believe the defendant should be put in the same position as if the transfer had not been made to plaintiff. That is to say, had the tankers been sold directly to the Argentine Naval Commission, the Government could have charged $135,-442.79 as class allowance and $28,756.81 for desirable features. These sums had been paid to the defendant and we hold that the defendant is entitled to retain

them. The only other damage defendant has suffered is the cost of unamortized repairs which would be charged to noncitizen purchasers.

The findings show that "during the time that the Commission was authorized to sell to noncitizens, it made a charge to the buyer of the unrecouped cost of repairs made subsequent to January 1, 1947, less depreciation at the rate of $6,-000 per month for each month of operation. This, for the *Sugarland* would have amounted to a charge of $49,894.01. If the policy respecting sales to citizens required a charge of the cost of unrecouped repairs made after July 1, 1947, the charge in the case of the *Sugarland* was $42 only, or $49,852.01 less."

Under section 6 of the Merchant Ship Sales Act, supra, 50 U.S.C.A.Appendix, § 1739, the sale price to noncitizens was merely the minimum statutory price. Therefore, plaintiff's purchase as a citizen saved $49,852.01 which defendant could have charged a noncitizen. The Government lost that amount and is entitled to recover the same under its counterclaim.

Since as a result of the dissolution of the plaintiff corporation, Manuel Rodriguez acquired all but $4,255.59 of the corporate assets and has been made a party plaintiff to answer the defendant's counterclaim, we hold that judgment will be entered against the plaintiff corporation and Manuel Rodriguez personally.

The plaintiff is not entitled to recover, and the petition of Manuel Rodriguez Trading Corporation is dismissed.

Defendant is entitled to recover of and from the plaintiffs, Manuel Rodriguez Trading Corporation and Manuel Rodriguez, on its counterclaim the sum of $49,852.01.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

of the Act, then such purchase price shall be decreased, within the limits of the floor price of the vessel, or increased, by such amounts, if any, as may be determined by the Commission pursuant to said clauses."